Agency in March 2003 and about the Company's BLA for Hemopure. The press release stated in pertinent part as follows:

> Biopure submitted the trauma protocol for a Phase II clinical trial of Hemopure for the treatment of hemorrhagic shock casualties in the hospital setting, where red blood cell transfusions are available. The FDA placed this trauma protocol under a new IND that is separate from the Company's previous IND and its BLA to market Hemopure for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The protocol sought to administer up to 15 units of Hemopure, a proposed dosage that was 50 percent higher than administered in previous clinical trials.
>
> After the in-hospital trauma protocol was submitted to the FDA and the new IND was assigned, the Agency placed a clinical hold on the proposed trauma trial due to safety concerns. The FDA referred to a review of adverse event data from the Company's Phase III orthopedic surgery trial, which was submitted in the BLA. The data from that Phase III trial has been previously presented at medical meetings.
>
> In May 2003, Biopure responded to the FDA's clinical hold and also filed the response as a BLA amendment because it discussed data previously submitted with the BLA. That amendment resulted in the FDA extending its BLA review period up to 90 days, as previously announced on May 30, 2003. The Agency also requested three additional pre-clinical animal studies of Hemopure in conscious swine to address its concerns regarding high-volume administration. After the Company's responses, the FDA has twice declined to lift the clinical hold, most recently in a letter dated July 30, 2003.

The press release also indicated that regulatory approval of the Hemopure BLA would be postponed at least until the second-half of calendar 2004:

> A Biopure-requested meeting has been scheduled with the FDA on January 6, 2004, to discuss the BLA. If there are significant developments at or following this meeting, the Company intends to report them promptly. Biopure still expects to

respond to the questions in the FDA's complete response letter by June 30, 2004.

38. Market reaction to Defendants' belated disclosures was swift and severe. On December 26, 2003, the first day of trading following Biopure's announcements, the price of Biopure common shares fell over 16% in value to close at $2.43 per share on trading volume of over 3 million shares.

### Undisclosed Adverse Information

39. The market for Biopure's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Biopure's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Biopure securities relying upon the integrity of the market price of Biopure's securities and market information relating to Biopure, and have been damaged thereby.

40. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Biopure's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including inter alia:

(a) that Biopure had been notified by the FDA, as early as March/April 2003 that the Company's clinical trials of Hemopure for trauma applications had been put on hold due to "safety concerns" arising from adverse clinical data reviewed by the FDA in connection with the Company's BLA for Hemopure orthopedic applications;

(b) that FDA approval of Biopure's BLA for commercial marketing of Hemopure in the United States was in serious doubt, and in any event could not have occurred sooner than late 2004; and

(c) based on the foregoing, Defendants' opinions, projections and forecasts concerning the Company and its operations were lacking in a reasonable basis at all times.

41. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Biopure's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Biopure and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER

42. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by

virtue of their receipt of information reflecting the true facts regarding Biopure, their control over, and/or receipt of information of Biopure's allegedly materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Biopure, participated in the fraudulent scheme alleged.

43. While Defendants were issuing false and misleading statements about Biopure and its business, the Company completed two offerings of its common shares generating over $30.6 million in proceeds. In addition, the Individual Defendants, together with other high-level Biopure insiders, directly or indirectly, disposed of over $1.6 million worth of personally-held stock, benefitting from the artificial inflation in Biopure's stock price their fraudulent scheme had created. The Individual Defendants sold shares during the Class Period as follows:

| NAME | DATE | Number of Shares | Price Per Share | Total Value |
| --- | --- | --- | --- | --- |
| Carl W. Rausch (CTO) | 4/15/03 | 30,000 | $3.13 | $93,900 |
| | 6/5/03 | 2,000 | $6.06 - $6.07 | $12,000 |
| | 6/24/03 | 3,000 | $5.58 - $5.698 | $17,000 |
| | 6/25/03 | 2,700 | $5.80 - $5.97 | $16,000 |
| | 6/26/03 | 34,374 | $5.80 - $5.90 | $201,000 |
| | 6/27/03 | 20,000 | $5.95 - $6.00 | $120,000 |
| | 6/30/03 | 5,000 | $6.14 - $6.16 | $31,000 |
| | 8/5/03 | 10,000 | $7.50 - $7.53 | $75,000 |
| | 8/6/03 | 2,000 | $7.50 - $7.54 | $15,000 |
| | 8/7/03 | 8,000 | $7.00 | $56,000 |
| | 8/8/03 | 10,000 | $7.05 - $7.28 | $72,000 |
| | 8/12/03 | 10,000 | $7.00 - $7.15 | $71,000 |
| | 8/13/03 | 9,500 | $7.02 - $7.15 | $67,000 |

| NAME | DATE | Number of Shares | Price Per Share | Total Value |
|---|---|---|---|---|
| | 8/28/03 | 100,000 | $7.50 | $750,000 |
| **TOTAL PROCEEDS FOR RAUSCH:** | | | | **$1,596,900** |
| | | | | |
| Thomas A. Moore (CEO) | 8/7/03 | 8,750 | $2.42 | $21,175 |
| **TOTAL PROCEEDS FOR MOORE:** | | | | **$21,175** |
| | | | | |
| **TOTAL INSIDER PROCEEDS:** | | | | **$1,618,075** |

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

44. At all relevant times, the market for Biopure's securities was an efficient market for the following reasons, among others:

(a) Biopure's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Biopure filed periodic public reports with the SEC;

(c) Biopure regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Biopure was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

45.     As a result of the foregoing, the market for Biopure's securities promptly digested current information regarding Biopure from all publicly available sources and reflected such information in Biopure's stock price. Under these circumstances, all purchasers of Biopure's securities during the Class Period suffered similar injury through their purchase of Biopure's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

46.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Biopure who knew that those statements were false when made.

**COUNT I**
**Violation Of Section 10(b) Of**
**The Exchange Act And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     Throughout the Class Period, Biopure and the Individual Defendants, carried out a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Biopure's securities; and (iii) cause Plaintiff and the other members of the Class to purchase Biopure's securities at artificially inflated prices. In furtherance of this unlawful scheme and course of conduct, Defendants took the actions set forth herein.

49.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Biopure's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

50.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative

statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §§ 210.01 et seq.) and Regulation S-K (17 C.F.R. §§ 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, and earnings so that the market price of the Company's securities would be based on truthful, complete, and accurate information.

51.    Biopure and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Biopure as specified herein.

52.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Biopure's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Biopure and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Biopure's securities during the Class Period.

53. The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

54. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Biopure's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Biopure's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Biopure's publicly-traded securities were artificially inflated, and relying directly or indirectly on

the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Biopure securities during the Class Period at artificially high prices and were damaged thereby.

56. At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Biopure, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Biopure securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

57. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of
### The Exchange Act Against The Individual Defendants

59. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60. The Individual Defendants acted as controlling persons of Biopure within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62. As set forth above, Biopure and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions each as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Biopure's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 14, 2004

**GILMAN AND PASTOR, LLP**

David Pastor (BBO #391000)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Tel: (781) 231-7850

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Mel E. Lifshitz
10 East 40th Street
New York, NY 10016
Tel: (212) 779-1414

**Attorneys for Plaintiff**